# SUPREME COURT OF THE UNITED STATES

CYNTHIA DAVIS, WARDEN *v.* DAVID M. SMITH

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 24–421.   Decided January 27, 2025

The petition for a writ of certiorari is denied.

JUSTICE THOMAS, with whom JUSTICE ALITO joins, dissenting from the denial of certiorari.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) sharply limits the power of federal habeas courts to review state criminal convictions. The statute permits relief only when there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Harrington* v. *Richter*, 562 U. S. 86, 102 (2011). Unfortunately, some Sixth Circuit judges have "acquired a taste for disregarding AEDPA" and our cases on how to apply it. *Rapelje* v. *Blackston*, 577 U. S. 1019, 1021 (2015) (Scalia, J., dissenting from denial of certiorari). The decision below is the latest example of this practice. Because I would not overlook the Sixth Circuit's blatant and repeated disrespect for the rule of law, I respectfully dissent.

I

Respondent David Smith met Quortney Tolliver in 2015, a few weeks before she was brutally attacked inside her mobile home. The two met through a mutual friend and took an 80-mile road trip to Cleveland to purchase crack cocaine. At some point after the trip, Smith asked Tolliver if he could buy crack from her. Tolliver informed Smith that her supply had run out, but the pair later agreed that Smith would drive Tolliver to Cleveland to restock in exchange for a discount on the drugs.

On the day they were supposed to make the trip, Smith

called Tolliver to confirm that she was ready. Tolliver indicated that she was, but Smith did not pick her up. Instead, shortly after the phone call ended, someone entered Tolliver's mobile home, brutally attacked her with a hammer, and robbed her.

When Tolliver regained consciousness, she stumbled outside and screamed for help. Neighbors called an ambulance to take her to the hospital. Due to the severity of her injuries, which included skull and facial fractures, Tolliver was placed in a medically induced coma for about two weeks.

As soon as Tolliver awoke from the coma, investigators came to the hospital to interview her. Tolliver's mother was in the room during the interview. Still unable to speak, Tolliver communicated through writing and hand signals. Investigators showed Tolliver photos of 24 individuals, none of whom was Smith. Tolliver did not identify any of the individuals as her attacker.

In the meantime, investigators continued to search for Tolliver's assailant. They determined that a phone number connected to Smith had exchanged 85 texts or calls with Tolliver's phone number in the 24 hours before the attack. Cell-location data also revealed that, on the day of the crime, Smith had traveled near Tolliver's home. And, DNA evidence recovered from the scene was consistent with Smith's DNA.

A few weeks after the initial interview with Tolliver, Lieutenant Greg Johnson visited her in a medical facility where she was recovering. Her mother was once again present. Johnson told Tolliver, "I think I found out who did this to you," adding that "[h]is name is David Smith" and "he knows you." *State* v. *Smith*, 2018-Ohio-4799, ¶¶13, 21 (App.) (internal quotation marks omitted). Johnson also showed Tolliver a photo of Smith. At first, Tolliver asked, "[W]ho is that?" *Id.*, ¶21 (internal quotation marks omitted). Seconds later, she said that she recognized Smith and recalled that he was coming to her home on the day of the

attack. Johnson explained that Smith's DNA was found in Tolliver's mobile home. He also said that Smith is "very violent" and "hoping you're dead." *Id.*, ¶100 (Grendell, J., dissenting) (internal quotation marks omitted). At some point during the interview, Tolliver told Johnson that she either dreamt or remembered that Smith hit her with a hammer.

A few weeks later, Tolliver was sentenced on unrelated drug charges. She asked Johnson to meet with her after the sentencing. During the meeting, she told him that she remembered the incident and knew that Smith was her attacker. Johnson asked whether Tolliver was sure this was not a dream. She confirmed that she was "'one hundred percent sure.'" 2024 WL 3596872, *3 (CA6, July 31, 2024). When asked why she had not previously revealed this information, Tolliver said that she did not want her mother to know that she was selling drugs. She also did not want her admission to affect her then-pending drug charges.

The State of Ohio charged Smith with attempted murder and other related crimes. Before trial, Smith moved to suppress Tolliver's identification on the ground that Johnson was unnecessarily suggestive when interviewing her. The trial court denied the motion, and a jury found Smith guilty of attempted murder, felonious assault, aggravated robbery, and aggravated burglary. The trial court sentenced him to 22 years in prison. On direct appeal, Smith renewed his argument for suppression of Tolliver's identification.

The Ohio Court of Appeals upheld the trial court's decision to admit the identification. 2018-Ohio-4799. The court acknowledged that Johnson's identification procedure was unnecessary and impermissibly suggestive. *Id.*, ¶37. But, the court correctly recognized that identifications tainted by unduly suggestive police procedures are excludable under the Fourteenth Amendment's Due Process Clause only in exceedingly rare circumstances. See *id.*, ¶¶36, 43. Under this Court's precedents, an identification is excludable

only if the testimony poses "'a very substantial likelihood of irreparable misidentification.'" *Perry* v. *New Hampshire*, 565 U. S. 228, 232 (2012). In other words, an identification that has "sufficient aspects of reliability" is admissible. *Manson* v. *Brathwaite*, 432 U. S. 98, 106 (1977). And, to determine whether an identification is sufficiently reliable, courts examine the totality of the circumstances. See *Neil* v. *Biggers*, 409 U. S. 188, 199 (1972). This Court has offered five factors, known as the *Biggers* factors, to guide that inquiry. See *id.*, at 199–200.

The Ohio Court of Appeals applied *Biggers* and held that Tolliver's identification was sufficiently reliable. See 2018-Ohio-4799, ¶¶38–49 (citing *Biggers*, 409 U. S., at 198–200). The Ohio Supreme Court denied review. *State* v. *Smith*, 156 Ohio St. 3d 1452, 2019-Ohio-2780, 125 N. E. 3d 947.

Smith then filed a federal habeas petition raising the same claim. The District Court determined that the state court's analysis was reasonable and denied relief. But, when Smith appealed to the Sixth Circuit, a divided panel reversed and directed the District Court to issue the writ, unless the State could hold a new trial within 180 days. 2024 WL 3596872.

## II

Judge Thapar's dissent offers a detailed account of the Sixth Circuit panel majority's errors. Two of those errors are particularly egregious.

First, the panel majority refused to apply AEDPA's highly deferential standard of review. Because the Ohio Court of Appeals rejected Smith's claim on the merits, AEDPA bars federal habeas relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U. S. C. §2254(d)(1). We have made unmistakably clear that a reviewing court may not "'essentially evaluat[e] the merits *de*

*novo*, only tacking on a perfunctory statement at the end of its analysis asserting that the state court's decision was unreasonable.'" *Shinn* v. *Kayer*, 592 U. S. 111, 119 (2020) (*per curiam*). Yet, the panel majority did just that.

The panel majority began its analysis by applying the *Biggers* factors in the first instance. 2024 WL 3596872, *9. It then appended a single-sentence assertion that "no fairminded jurist could possibly" disagree with its analysis. *Ibid.* The panel majority's exercise in *de novo* review sidestepped the operative legal question under AEDPA— whether there is "no possibility fairminded jurists could disagree that *the state court's decision* conflicts with this Court's precedents." *Harrington*, 562 U. S., at 102 (emphasis added). That inquiry requires substantial deference to the state court's determinations. *Ibid.*

To be sure, the panel majority acknowledged in passing its obligation to "examine all theories that could have supported the state court's conclusion." 2024 WL 3596872, *9. But, rather than perform that task, the panel majority faulted the state court for a supposed error that is not clearly established under this Court's precedents. See *ibid.* Specifically, it took issue with the state court's heavy reliance "upon the fact that Tolliver knew Smith before the crime" when assessing the reliability of Tolliver's identification under the totality of the circumstances. *Ibid.* According to the panel majority, the fact that a victim knows a suspect is relevant only if the court first determines that "a majority of the *Biggers* factors cut in favor of a finding of reliability." *Ibid.* This Court has never identified such a limitation. Without a Supreme Court decision that "squarely establishe[s]" the "specific legal rule" invoked by the prisoner, the state court's decision could not have involved "an unreasonable application of clearly established

Federal law." *Harrington*, 562 U. S., at 101 (internal quotation marks omitted).*

To the extent that the panel majority disagreed with the degree to which the state court's analysis relied on Tolliver's prior interactions with Smith, it was left with a mere "disagreement . . . about how to weigh evidence." 2024 WL 3596872, *15 (Thapar, J., dissenting). In that instance, as Judge Thapar well explained, AEDPA requires a federal court to defer to the state court, unless "clearly established Supreme Court precedent stands in the way." *Ibid.* The panel majority flouted AEDPA's command.

The panel majority also erred by critiquing the Ohio court's opinion-writing style rather than its judgment. The panel majority faulted the Ohio Court of Appeals for "largely fail[ing]" to apply *Biggers* and "halfheartedly devoting a couple sentences to its analysis." 2024 WL 3596872, *7, *9. But, a state court need not explain its reasoning at all. See *Harrington*, 562 U. S., at 98 ("There is no text in [§§2254(d)(1)–(d)(2)] requiring a statement of reasons"). Federal courts "have no authority to impose mandatory opinion-writing standards on state courts." *Johnson* v. *Williams*, 568 U. S. 289, 300 (2013). And, in any event, the Ohio Court of Appeals cited and quoted directly from *Biggers*, listed its factors, and analyzed the correct legal question—that is, whether Tolliver's identification was reliable under the totality of the circumstances. See 2018-Ohio-4799, ¶¶37–49. As Judge Thapar explained, the majority implausibly assumed that the state court "refused to apply a test it had taken the trouble to recite," and then it mistakenly focused on the state court's "reasoning rather than its bottom-line decision." 2024 WL 3596872, *14 (dissenting

_____

*I doubt that the panel majority's analysis could pass muster even under *de novo* review. It strains credulity to think that previous interactions with a suspect would not bear on a totality-of-the-circumstances assessment of reliability.

opinion) (internal quotation marks omitted). "'[M]ischaracterization of the state-court opinion'" is a "path that we have long foreclosed." *Dunn* v. *Reeves*, 594 U. S. 731, 742 (2021) (*per curiam*) (quoting *Woodford* v. *Visciotti*, 537 U. S. 19, 22 (2002) (*per curiam*)).

The panel majority's errors have real consequences. The State of Ohio must retry Smith for a crime committed nearly a decade ago. That result comes at a steep cost for both society and the victim. Retrial diverts significant time and resources away from other law enforcement activities, and it is often "more difficult" because of "the 'erosion of memory' and 'dispersion of witnesses' that accompany the passage of time." *Brecht* v. *Abrahamson*, 507 U. S. 619, 637 (1993). Moreover, retrials "inflic[t] substantial pain on crime victims who must testify again and endure new trials." *Edwards* v. *Vannoy*, 593 U. S. 255, 263 (2021). And, there is always a risk that retrial is unsuccessful. "When previously convicted perpetrators of violent crimes go free merely because the evidence needed to conduct a retrial has become stale or is no longer available, the public suffers, as do the victims." *Ibid.*

I would have granted certiorari and summarily reversed. Smith did not make the required showing for habeas relief, and the Sixth Circuit's analysis blatantly disregards both AEDPA and this Court's precedents in order to give Smith a regrettable windfall.

### III

The decision below is the latest in a long line of Sixth Circuit AEDPA errors. This Court has reversed the Sixth Circuit at least two dozen times for misapplying AEDPA. See *Shoop* v. *Twyford*, 596 U. S. 811 (2022); *Brown* v. *Davenport*, 596 U. S. 118 (2022); *Cassano* v. *Shoop*, 10 F. 4th 695, 696–697 (CA6 2021) (Griffin, J., dissenting from denial of rehearing en banc) (collecting 22 earlier cases in which this

Court reversed the Sixth Circuit "for not applying the deference to state-court decisions mandated by AEDPA"). And, these reversals only scratch the surface of the Sixth Circuit's defiance. See, *e.g.*, *Shoop* v. *Cunningham*, 598 U. S. ___ (2022) (THOMAS, J., dissenting from denial of certiorari); *Shoop* v. *Cassano*, 596 U. S. ___ (2022) (THOMAS, J., dissenting from denial of certiorari); *Blackston*, 577 U. S. 1019 (opinion of Scalia, J.). "That court's record of 'plain and repetitive' AEDPA error is an insult to Congress and a disservice to the people of Michigan, Ohio, Kentucky, and Tennessee." *Cunningham*, 598 U. S., at ___ (opinion of THOMAS, J.) (slip op., at 13) (citation omitted). The Sixth Circuit can and must do more to correct its own errors. See *ibid.*

Some "reluctance in deploying en banc review is understandable," but "only to a point." *Id.*, at ___ (slip op., at 14). "The Sixth Circuit's habeas problems are well past that point—as evidenced by the depressing regularity with which petitions like this one reach us." *Ibid.* When wayward panels refuse to apply AEDPA, hopefully, the Sixth Circuit will correct its errors by rehearing the case en banc. See 28 U. S. C. §46(c); Fed. Rule App. Proc. 40(c).

This Court also has a job to do. While "primary responsibility for the Sixth Circuit's errors rests with the Sixth Circuit," we too must "correct classic AEDPA abuses, especially when a lower court brazenly commits errors for which we have repeatedly reversed it." *Cunningham*, 598 U. S., at ___ (opinion of THOMAS, J.) (slip op., at 13). I would have summarily reversed the judgment below to ensure that federal courts do not exceed their very limited role in collateral review of state criminal convictions. I respectfully dissent from the denial of certiorari.